65 P.3d 350 (2003)
Bradley R. HARRIS, Respondent/Cross Appellant,
v.
Doris and Dennis DRAKE, Appellants/Cross Respondents.
No. 27402-7-II.
Court of Appeals of Washington, Division 2.
March 18, 2003.
*352 David Hadley Middleton, Federal Way, WA, Marilee C. Erickson, Reed McClure, Seattle, WA, for Appellants/Cross-Respondents.
Kari Ingrid Lester, Ben F. Barcus & Associates PLLC, Tacoma, WA, for Respondents/Cross-Appellants. *351
*353 MORGAN, J.
The main question in this appeal is whether, in an action brought by a PIP (Personal Injury Protection) insured against a third-party tortfeasor, the work product privilege protects facts and opinions acquired, prepared, and developed by a PIP medical examiner whom the PIP insured does not expect to call at trial. In our opinion, the answer is yes.
On April 26, 1996, Bradley Harris was rear-ended by Doris Drake. He did not seek medical attention at the scene. That night, however, he began having "shooting pain deep in his left shoulder."[1]
The next day, Harris went to a hospital emergency room. The staff determined that he did not have any broken bones and released him with medication for pain and inflammation.
For the next twenty months, Harris had problems with his left shoulder. He saw Dr. Grannis, a chiropractor; Dr. Finkleman, a family-practice physician; Dr. Hoffmeister, an orthopedic surgeon; Dr. Nacht, another orthopedic surgeon; and three different physical therapists. He did not improve significantly.
In September, 1997, Dr. Nacht diagnosed "anterior impingement syndrome" in the left shoulder. On October 30, 1997, Dr. Nacht performed arthroscopic surgery for that condition. By December 11, 1997, Harris was pain-free with full range of motion in his left shoulder. Harris had his last physical therapy treatment on December 15, 1997, and moved to Georgia in February, 1998.
Shortly after the accident, Harris filed a PIP claim with his own insurer, United Services Automobile Associates (USAA). His policy contained a cooperation clause that gave USAA the right to demand an independent medical examination. The record does not show whether the policy contained a PIP arbitration clause.
In the fall of 1996, USAA demanded an independent medical examination and retained Dr. Brandt Bede to perform it. Dr. Bede conducted the examination on November 26, 1996.
After examining Harris, Dr. Bede wrote two reports. In the first, dated the same day as the examination, Dr. Bede opined that Harris had an "impingement syndrome of the left shoulder related to the motor vehicular accident."[2] In the second report, dated February 19, 1998, Dr. Bede opined that Harris' "impingement syndrome is unrelated to the motor vehicular accident of April 26, 1996."[3]
Harris sued Drake on May 29, 1998. During discovery, Drake listed Dr. Bede as a medical expert whom she intended to call at trial. Harris did not object at that time.
On April 9, 2001, the day before trial started, Harris served on Drake a motion in limine in which he asked the court to exclude Dr. Bede's testimony. The parties argued the motion on April 10, the first morning of trial. Harris asserted that Dr. Bede's examination was privileged work product under Heidebrink v. Moriwaki;[4] that Drake was required to proceed under CR 35 "rather than try to adopt a PIP exam";[5] and that he, Harris, could not cross-examine Dr. Bede for bias in favor of the insurance industry without suggesting, contrary to the collateral source rule, that USAA had "already covered" his medical bills.[6] Drake responded that Harris lacked standing to object on work product grounds; in the words of her attorney,
it's not necessarily Mr. Harris's objection to make.... [I]f the insurance company was a party to this litigation and was standing before you, they might have the ability to say, "Wait a minute. That's our consulting expert. You can't call him at trial." But they're not here.[[7]] *354 Drake further responded that Harris' claim should fail on its merits in light of Johnson v. McCay;[8] that CR 35 did not affect her ability to call Dr. Bede; and that Harris could "ask about bias without raising insurance."[9] Harris replied that he had standing because he and USAA were "aligned."[10]
During the course of these arguments, the trial court wondered what USAA would do "if they knew their PIP expert was being used to defeat their [subrogation] claim for PIP benefits."[11] The trial court then asked counsel to call USAA and ascertain its position. A short time later, plaintiff's counsel reported that he, or possibly he and defense counsel together,[12] had called JoAnne Randolph, a "subrogation specialist" at USAA Randolph had stated that USAA "would not allow the calling of Dr. Bede," and that USAA "will not take a position adverse to their insured[.]"[13] The trial court then granted Harris' motion to exclude Dr. Bede's testimony.
Drake immediately moved for a continuance. She argued that Harris had not brought his motion until "the day before trial";[14] that the court's ruling "extend[ed] the law"[15] and left her without medical testimony; and that she needed time to "get an expert to address the medical issues."[16] The court denied a continuance.
At trial, Drake admitted liability. She wanted to present, but the trial court did not allow her to present, evidence that Harris had complained about pain to a chiropractor in February, 1995, fourteen months prior to the accident. At the end of the evidence, the trial court directed a verdict for Harris on causation and special damages, leaving general damages for the jury. The jury returned a verdict for Harris in the amount of $140,965, and the trial court later denied Harris' motion for prejudgment interest on his special damages.
Drake appeals, and Harris cross-appeals. The central issue is whether the trial court erred by excluding Dr. Bede's testimony. Additional issues are whether the trial court erred by denying Drake's motion for continuance; by not permitting Drake to prove that Harris had complained to a chiropractor in February, 1995; by granting a directed verdict on some issues; and by denying Harris' motion for prejudgment interest.

I.
The main issue on appeal is whether Dr. Bede's expert opinions, together with the factual bases for those opinions, were within the work product privilege. The goal of that privilege is "to protect the adversary process"[17] by insuring that neither party pirates the trial preparation of another party.[18]
The work product privilege is described in CR 26(b)(4)[19] and CR 26(b)(5).[20] *355 These rules must be read together where, as here, "work product is claimed and discovery from an expert is sought."[21] As noted by a concurring opinion in In re Firestorm 1991:
A number of courts have recognized the interplay between the work product provision of FED.R.CIV.P. 26(b)(3) and the provision governing discovery from experts involved in trial preparation, former FED. R.CIV.P. 26(b)(4). E.g., Bogosian v. Gulf Oil Corp., 738 F.2d 587 (3d Cir.1984); Haworth, Inc. v. Herman Miller, Inc., 162 F.R.D. 289 (W.D.Mich.1995); Dominguez v. Syntex Lab., Inc., 149 F.R.D. 158[ ] (S.D.Ind.1993); North Carolina Elec. Membership Corp. v. Carolina Power & Light Co., 108 F.R.D. 283 (M.D.N.C.1985). The court in Bogosian explained:
The first paragraph of Rule 26(b)(3)[[22]] consists of two sentences .... the first sentence requires a showing of "substantial need" before work product must be produced. The second sentence requires protection against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party. The proviso introduces the first sentence of Rule 26(b)(3) ("Subject to the provisions of subdivision (b)(4)[[23]] of this rule, a party may obtain discovery of documents... prepared in anticipation of litigation or for trial ...") and signifies that trial preparation material prepared by an expert is also subject to discovery, but only under the special requirements pertaining to expert discovery set forth in Rule 26(b)(4)....[[24]]
Although CR 26(b)(4) and CR 26(b)(5) are closely related, CR 26(b)(5) controls in the event of a conflict. CR 26(b)(5) provides that when a party retains an expert who acquires or develops facts and opinions in anticipation of litigation, and the party does not expect to call that expert at trial, another party may obtain discovery "only as provided in rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means."[25] CR 26(b)(4) provides, "subject *356 to the provisions of subsection (b)(5)," that when a party or its representative prepares a document or tangible thing in anticipation of litigation, another party may obtain discovery "only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he [or she] is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[26] Neither rule protects information not acquired, prepared, or developed in anticipation of litigation, or information acquired, prepared, or developed by an expert expected to be called at trial by the party who retained him or her.
To apply these rules here, it is necessary to distinguish PIP arbitration or PIP litigation[27] between USAA and Harris from tort litigation between Harris and Drake. Then, it is necessary to address three major questions: (A) Did the work product privilege attach in anticipation of PIP litigation or PIP arbitration between USAA and Harris? (B) If the privilege attached, did it terminate before the trial of this tort litigation between Harris and Drake? (C) If the privilege attached and did not terminate, was it properly claimed at the trial of this tort litigation between Harris and Drake?

A.
Heidebrink v. Moriwakiw[28] is Washington's leading case on when work product is acquired, prepared, or developed "in anticipation of litigation." It directs that we answer that question by examining "the specific parties involved and the expectations of those parties."[29]
In Heidebrink, the Supreme Court described its view of the parties and their expectations when, after an accident, a liability insured gives information to a liability insurer. On March 15, 1982, Moriwaki was burning grain stubble in a field adjacent to the highway. The resulting smoke obscured the vision of passing drivers and caused a chain reaction collision. A driver, Heidebrink, was injured. Two days later, on March 17, 1982, Moriwaki gave a tape-recorded statement to an adjuster employed by his liability carrier. As far as the opinion shows, neither Moriwaki nor Heidebrink had yet decided to litigate, or even contacted an attorney.
Several months later, Heidebrink sued Moriwaki for her personal injuries. In the discovery phase of the case, she requested a copy of Moriwaki's statement to his liability carrier. Moriwaki and his carrier refused, claiming work product. Sustaining that refusal, the Supreme Court ruled that when a liability insured gives his or her liability insurer a statement after an accident, the statement is prepared "in anticipation of litigation" even though no one has yet decided to litigate or even contacted an attorney. The court reasoned (1) that insureds are contractually obligated to provide such statements, and thus that they expect their carriers *357 to hold such statements in confidence; (2) that insureds expect their carriers to forward such statements to counsel when counsel is obtained; (3) that insureds will be hesitant to reveal their knowledge to their insurers unless their statements are protected; and (4) that insureds will bear the burdens of insurance without reaping its benefits unless their statements are protected.[30]
Heidebrink's reasoning applies as much to information given by a PIP insured to a PIP insurer (either directly or through the PIP insurer's medical expert) as to information given by a liability insured to a liability insurer (or the liability insurer's representative). Just as a liability insured is contractually obligated to provide accident information by giving a written or recorded statement at the liability insurer's request, a PIP insured is contractually obligated to provide medical information by submitting to a independent medical examination at the PIP insurer's request. Just as a liability insured expects his or her accident information to be held in confidence, a PIP insured expects his or her medical information to be held in confidence. (Indeed, a PIP insured may expect his or her medical condition to be held more confidentially than a liability insured's accident information.) Just as a liability insured will be hesitant to reveal accident information that is not protected from disclosure to the tortfeasor, a PIP insured will be hesitant to reveal medical information that is not protected from disclosure to the tortfeasor. Just as a liability insured will be hampered from reaping the benefits of liability insurance unless accident information is protected, a PIP insured will be hampered from reaping the benefits of PIP insurance unless medical information is protected. Accordingly, we hold that information given by a PIP insured to a PIP insurer (or the PIP insurer's medical examiner) under the circumstances present here is given in anticipation of PIP litigation or PIP arbitration within the meaning of CR 26(b)(4) and 26(b)(5), and that such information is entitled to the same degree of work product protection as information given by a liability insured to a liability insurer in anticipation of third-party tort litigation. It would be inconsistent and unfair to hold that a PIP insured (usually a plaintiff in later tort litigation) does not act in anticipation of a PIP dispute when he or she gives information to a PIP medical examiner seven months after an accident, while at the same time holding, as Heidebrink requires, that a liability insured (usually a defendant in later tort litigation) does act in anticipation of third-party litigation when he or she gives information to a liability insurance adjuster only two days after an accident.
In this case, USAA retained Dr. Bede to verify or refute Harris' PIP claims. On November 26, 1996, Dr. Bede acquired information from Harris by examining him, then used that information to prepare and develop opinions concerning Harris' condition. Given Heidebrink's holding that a liability insurer was acting in anticipation of tort litigation only two days after the accident, USAA and Dr. Bede were certainly acting in anticipation of PIP litigation or PIP arbitration more than seven months after the accident. Accordingly, we hold that the work product privilege initially attached to the information that Dr. Bede acquired, and to the opinions that he thereafter prepared and developed.

B.
We turn next to whether work product protection terminated before the trial in this case. We inquire (1) whether work product protection terminates when the litigation or arbitration in which it initially attached terminates, and (2) whether work product protection terminates at the end of the discovery phase of the litigation or arbitration in which it is presently being claimed.

1.
As just seen, our first termination-related inquiry is whether work product protection can be claimed after the proceeding in which the protection attached has been concluded. In at least three cases, the Washington Supreme Court has said yes.
*358 In Pappas v. Holloway,[31] Holloway retained Pappas and several other lawyers as co-counsel in litigation involving diseased cattle. After that litigation had ended, Pappas sued Holloway for fees, and Holloway counterclaimed against Pappas for legal malpractice. Pappas then cross-claimed against his former co-counsel and sought to discover documents they had prepared in anticipation of the diseased-cattle litigation. The trial court denied work product protection to cocounsel, reasoning that "the materials Pappas requested were prepared in anticipation of litigation which had already terminated."[32] Rejecting this position, the Washington Supreme Court stated:
We disagree with the trial court that the protection provided by the work-product doctrine ceases after the litigation for which the documents were prepared has terminated.
. . . .
Courts have generally relied on Hickman in holding the work-product doctrine continues to protect materials prepared in anticipation of litigation even after the litigation has terminated.... We agree that the underlying purposes served by the work-product doctrine and articulated in Hickman can be preserved only if the protection attaches even after litigation has terminated. For this reason we hold the trial court erred in ruling the work-product doctrine did not apply in this case.[[33]]
The court ultimately held that Pappas had demonstrated "substantial need" for the documents that he sought.
In Dawson v. Daly[34] and Limstrom v. Ladenburg,[35] the Washington Supreme Court revisited the same question. The Dawson court stated, "The protection of the work product rule is triggered prior to the official initiation of litigation and extends beyond the official termination of litigation."[36] The Limstrom court stated, "The work product rule continues to protect materials prepared in anticipation of litigation even after the litigation has terminated."[37]
Drake relies on Johnson v. McCay.[38] In December, 1990, Johnson was a passenger in Turner's car when McCay rear-ended Turner's car. Johnson incurred medical expenses, so she made a PIP claim against Turner's PIP carrier, Allstate. Allstate demanded that Johnson submit to a PIP medical examination by Dr. Grow, and the examination took place in October, 1991. In March, 1992, Johnson sued McCay for negligence, and in June, 1993, the case was tried. When McCay wanted to call Dr. Grow as a witness, Johnson claimed work product protection. The trial court sustained her claim, and McCay appealed. Division Three stated:
Had Ms. Johnson and Allstate been the litigants here, and had Dr. Grow been retained by Ms. Johnson, her attorneys, or her insurance carrier, his medical evaluation of Ms. Johnson would clearly have been in anticipation of litigation. But this litigation is between Ms. Johnson and Ms. McCay.... Allstate, the party requiring the medical examination, was neither a party nor the representative of a party....[[39]]
Division Three went on to say that work product protection applies "only insofar as the information sought was obtained for the very purpose of preparing for the litigation in question";[40] that "Dr. Grow's medical *359 examination ... was not ... in anticipation of this litigation";[41] and, similarly, that "Dr. Grow's medical examination ... was not performed in anticipation of the instant litigation."[42] Division Three ultimately concluded that the trial court had erred by sustaining Johnson's claim of work product protection, but that the error was harmless under the particular circumstances. Division Three seems to have reasoned in part that work product protection could have been claimed in the earlier PIP proceeding between Johnson and Turner's PIP carrier (Allstate), but that work product protection could not be claimed in a different proceeding, including but not limited to the present tort litigation between Johnson and McCay. We think, however, that this reasoning runs counter to Pappas, Dawson, and Limstrom, and that we are obligated to follow the Supreme Court.[43] Accordingly, we hold here that work product protection did not terminate when the Harris-USAA PIP proceeding terminated.[44]

2.
Our second termination-related inquiry is whether work product protection can be claimed after the end of the discovery phase of the case in which the claim is made. The Washington cases uniformly answer yes.[45] Here then, the work product protection that attached to Dr. Bede's facts and opinions on November 26, 1996 did not terminate before the date of trial, April 10, 2001.

C.
We turn next to whether work product protection was properly claimed at the trial of this case. We inquire (1) who had standing to claim work product protection and (2) whether that person made a proper claim. We refer to a person with standing as a "holder" of the privilege.[46]

1.
In general, the holders of work product protection are the person who prepared a document or tangible thing in anticipation of litigation, or who retained an expert to acquire and develop facts and opinions in anticipation of litigation, plus that person's attorney, if any.[47] USAA retained Dr. Bede *360 to acquire information and develop opinions that would aid USAA in PIP litigation or PIP arbitration with Harris. As far as the record shows, no attorneys were involved in theanticipated PIP proceeding. Here then, USAA is the holder of the work product protection that attached to the facts and opinions that Dr. Bede acquired, prepared, and developed in anticipation of the Harris-USAA PIP proceeding.

2.
Harris argues that USAA properly claimed work product protection in this case. He reasons that USAA properly claimed work product protection over the telephone, or that he properly claimed such protection on USAA's behalf in open court. By citing and relying on Johnson, Drake responds in effect that USAA did not properly claim work product protection because it was not a party to the present case of Harris against Drake. Relying on cases like Mahler v. Szucs,[48]Lenzi v. Redland Insurance Company,[49] and Fisher v. Allstate,[50] Harris replies that USAA is a party to the present case even though it is not named as such. He further replies, alternatively, that USAA can properly claim the privilege even if it is not a party to this case.
These contentions give rise to two questions that we address here, and a third that we need not address. The two questions we address are (a) whether USAA can claim work product protection even if it is not a party to this current case between Harris and Drake, and (b) whether USAA or Harris made a proper claim on USAA's behalf. The question we need not address is whether USAA is a party here.

a.
The first question is whether a person who prepared a document or tangible thing in anticipation of prior litigation, or who retained an expert who acquired and developed facts and opinions in anticipation of prior litigation, can claim work product protection only if he or she is a party to the present litigation. The Supreme Court seems to have answered no; Division One has squarely answered no; but Division Three seems to have answered yes.
The Supreme Court's apparent answer is found in Pappas, Dawson, and Limstrom. In each of those cases, as discussed above, the Supreme Court ruled that a holder of work product protection can claim such protection even after the termination of the litigation in which the protection initially attached. A necessary predicate is that a holder has a claimable interest in his or her work product even after he or she is no longer a party to the prior litigation; and that is very close to saying that a holder has a claimable interest even if not a party to any litigation.
Division One's answer is found in Dever v. Fowler.[51] The King County Prosecutor charged Dever with arson. The prosecutor prepared various documents in anticipation of trial, but then dismissed the charge before trial. Dever then sued the investigating fire marshal and his employer, the City of Seattle, for malicious prosecution. In the discovery phase of the civil case, Dever sought documents the prosecutor had prepared in anticipation of the criminal trial. The prosecutor claimed work product protection, even though he was not a party to the civil case. Division One granted such protection, ruling as follows:

*361 The language found in former CR 26(b)(3)[now CR 26(b)(4)] does not limit work-product protection to parties to the instant litigation. We conclude, "based on the underlying purposes served by the work-product doctrine", that protection under the work-product doctrine extends to documents prepared in anticipation of any litigation, regardless of whether the party from whom it is requested is a party in the present litigation. Thus, the work product rule extends to the documents prepared by the prosecuting attorneys.[[52]]
We agree with Dever's conclusion that the civil rules "dot not limit work product protection to parties to the instant litigation."[53] CR 26(b)(4) and (b)(5) state that work product must be prepared, acquired, or developed in anticipation of litigation "by or for another party." The rules simply do not address whether the quoted words mean (a) "another party" to the present case or (b) "another party" to the former case in whose favor work product protection previously attached.
Moreover, we agree with Dever's conclusion that "the work product doctrine extends to documents prepared in anticipation of any litigation, regardless of whether the party from whom it is requested is a party in the present litigation."[54] Suppose two situations. In one, A and B file a joint complaint against X. In the other, A and B file separate complaints against X. The subject matter of all three complaints is the same. In the first situation, X cannot pirate A or B's trial preparation because work product protection applies. In the second, should X be able to obtain A's trial preparation for use against B, and B's trial preparation for use against A? We think not. A should be able to claim work product protection for his trial preparation, and B for his, whether they bring the same or separate suits and, if they bring separate suits, even if neither is a party to the other's suit.
Dever's conclusions find support in a text called Wright's Federal Practice. The authors of that text state:
A related problem of coverage arises due to the fact that under the rule the protection extends only to documents obtained by "another party" or his representative and in context this rather clearly means another party to the litigation in which discovery is being attempted. Documents prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit. Thus suppose A and B are bringing independent antitrust actions against the same defendant based on the same charges. Documents that A has prepared in anticipation of the litigation would be within the qualified immunity in his own suit but would be freely discoverable by defendant on a subpoena duces tecum issued in connection with the suit brought by B. Such a result would be intolerable. Fortunately the courts need not be confined by a literal reading of Rule 26(b)(3) and can continue to arrive at sensible decisions on this narrow point. To the extent that rule 26(b)(3), literally read, seems to give insufficient protection to material prepared in connection with some other litigation, the court can vindicate the purposes of the work-product rule by the issuance of a protective order under Rule 26(c).[[55]]
In sum then, the authors state (1) that it "would be intolerable" to allow a person to claim work product protection only if he or she is a party to the present litigation, and (2) that courts should "continue to arrive at sensible decisions on this narrow point" either (a) by not confining themselves to "a literal reading" of the work product rules or (b) by issuing protective orders under Rule 26(c).
*362 Division Three's apparent answer is found in Johnson v. McCay.[56] Quoting a small part of the above passage from Wright's Federal Practice, the Johnson court stated: "Documents prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)."[57] In our view, however, the Johnson court overlooked Dever, Pappas, and Dawson (Limstrom had not yet been decided). It also misapprehended the position of Wright's text on whether the quoted statement should be adopted as law. Respectfully disagreeing with Division Three, we conclude, as Division One did in Dever, that one who is otherwise a holder can claim work product protection "regardless of whether [he or she] is a party in the present litigation."[58]

b.
The next question is whether USAA or Harris properly claimed the privilege in this case. If USAA properly claimed, it did so over the telephone. If Harris properly claimed on USAA's behalf, he did so in open court.
We turn first to whether USAA properly claimed on its own behalf over the telephone. Harris' counsel called USAA at the trial court's direction. He spoke to a person at USAA who identified herself as JoAnne Randolph. The record shows that Randolph was a "subrogation specialist," but it shows nothing about whether USAA's "subrogation specialists" were authorized to claim or waive work product protection on USAA's behalf. The record suggests that Drake's counsel may have participated in the phone call, but it does not show that explicitly. The record does not show that USAA ever claimed in writing or on the record of the court. Given no more than this, we decline to hold that USAA made a proper claim over the telephone.[59]
We turn next to whether Harris properly claimed on USAA's behalf in open court. A person who has a sufficient relationship or former relationship with the holder is sometimes permitted to assert a privilege on the holder's behalf in the holder's absence, in order that the holder's claim be preserved until the holder's wishes can be ascertained. In Olson v. Haas,[60] for example, an attorney was permitted to assert the attorney-client privilege on behalf of the holder, a former client, pending ascertainment of the client's wishes.[61]
*363 The relationship between PIP insured and PIP insurer is such that the PIP insured should be allowed to claim on behalf of the PIP insurer in the latter's absence. The PIP insurer owes a PIP insured a quasifiduciary duty to "deal fairly" with the insured, "giving equal consideration in all matters to the insured's interests as well as its own."[62] As a result, it is highly unlikely that a PIP insurer will ever want to deviate from the wishes of its insured in any way that might adversely affect its insured. In this case then, Harris was entitled to claim the work product privilege on USAA's behalf until USAA manifested a contrary desire; USAA never manifested a contrary desire; and the trial court did not err by granting USAA work product protection.
Although CR 26(b)(4) and (5) have been the basis of our discussion so far, CR 35 supports our result also.[63] CR 26(b)(5) provides that facts and opinions are discoverable from a consulting expert only "as provided in CR 35(b)" or on a showing of "exceptional circumstances." CR 35 gives a person the right to have a representative present during an independent medical examination; the right to audiotape the examination; and the right to videotape the examination if the court so orders. CR 26(b)(5) expressly incorporates CR 35(b), and CR 35's safeguards would be circumvented if, after a PIP carrier demands an independent medical examination under the PIP provisions of its policy, a liability insurer could call the PIP medical examiner as its expert.
Summarizing, we hold that work product protection initially attached in anticipation of a Harris USAA PIP proceeding; that work product protection did not terminate before the trial of this case; that USAA was the holder of work product protection at the trial of this case; and that Harris was entitled to claim, and effectively did claim, the work product protection to which USAA was entitled. Drake does not contend, nor could she contend on this record,[64] that Dr. Bede's facts and opinions were discoverable "as provided in CR 35(b)" or that there were "exceptional *364 circumstances" of the kind described in CR 26(b)(5). We conclude that the trial court did not err by granting work product protection in this case.

II.
Four issues remain. (A) Did the trial court err when, on the first morning of trial, it declined to continue the trial? (B) Did the trial court err by not allowing Drake to introduce evidence that in February 1995 Harris had complained of pain to a chiropractor? (C) Did the trial court err by directing a verdict on causation and special damages? (D) Did the trial court err by refusing to award Harris prejudgment interest on his medical bills and other special damages?

A.
Drake contends that the trial court was required to grant (i.e., that the trial court lacked discretion to deny) the motion for a continuance that she made on the first morning of trial. She argues, in effect, that Harris surprised her by bringing his motion to exclude Dr. Bede's testimony on the afternoon before trial was to start; that the trial court surprised her by granting Harris' motion; that the trial court's ruling left her without a medical expert; and thus that she was entitled to a continuance.
We review a trial court's decision to grant or deny a continuance for abuse of discretion.[65] Discretion is abused only if exercised for untenable reasons.[66] Drake knew or should have known that Johnson v. McCay was not settled law, and that she was assuming a risk by listing a PIP examiner as the only medical expert whom she intended to call at trial. Drake had had nearly three years to obtain an independent medical examination under CR 35. The trial had already been continued eight times.[67] These are tenable reasons for denying a continuance and ordering that the trial proceed. The trial court did not abuse its discretion in this case.

B.
Drake argues that the trial court erred by not permitting her to prove that in February 1995, about fourteen months before the accident in issue here, Harris had complained of pain to a chiropractor. She did not call the chiropractor in her offer of proof, relying instead on testimony from Harris, Dr. Nacht, and Dr. Finkleman. Harris testified that he had seen the chiropractor for "mid and low back pain"[68] that had subsided prior to the accident in issue here. Dr. Nacht testified that one of the chiropractor's chart notes said, "left shoulder pain, MRI 2/24/95"; that he had "no idea what that means"; and that he did not know whether an MRI had been done at that time. Dr. Finkleman testified that in the six months prior to the accident, Harris had not suffered from "ongoing pain or discomfort" in his left shoulder.[69] Dr. Finkleman also testified that after the accident, Harris suffered from an "impingement syndrome" of the left shoulder that "was directly related to the motor vehicle accident" and was not a preexisting condition.[70] There was no evidence whatever that Harris was experiencing shoulder or back pain just prior to the accident, so the trial court sustained Harris' relevance objection.
We agree with the trial court's ruling. When an accident lights up and makes active a pre-existing condition that was dormant and asymptomatic immediately prior to the accident, the pre-existing condition is not *365 a proximate cause of the resulting damages.[71] Even assuming that Harris had some sort of pre-existing condition in his left shoulder,[72] the only reasonable inference from Drake's offer of proof was that such condition was dormant and asymptomatic just prior to the accident. The offer of proof had no tendency to prove a fact of consequence to the action,[73] and the trial court correctly ruled that it was irrelevant.

C.
Drake argues that the trial court erred by granting a verdict on causation and special damages. She does not contest fault. A directed verdict is proper when only one view of the evidence is reasonable.[74]
Dr. Finkleman and Dr. Nacht both testified that the accident had caused injury to Harris. They also testified that Harris' special damages were reasonably related to the accident. There was no testimony to the contrary, and thus only one reasonable view of the evidence.
Drake contends that we should draw a contrary, competing inference on causation (1) because in May 1996 a chiropractor who did not testify ordered an MRI that is not in the record; (2) because Dr. Nacht testified that Harris had a pre-existing asymptomatic bony prominence in his left shoulder; and (3) because Dr. Nacht testified that a professional painter like Harris is susceptible to impingements of the shoulder. Even assuming that such evidence warrants an inference that Harris had a pre-existing condition, it does not warrant an inference that such condition was symptomatic just prior to the accident, and thus it cannot affect causation.[75] The trial court did not err by ruling as it did.

D.
In his cross-appeal, Harris contends that the trial court erred by not granting prejudgment interest on his accident-related medical expenses, travel expenses, and property damages "from the date of the bill or loss."[76] A claim does not draw interest until it is liquidated.[77] A claim for medical expenses is not liquidated until the judge or jury determines that the expenses were reasonably and necessarily incurred.[78] The same is true of a claim for accident-related travel expense and property damage.[79] Harris' special-damage claims were unliquidated until the trial court directed a verdict, so he is entitled to interest only from that time.[80]
Affirmed.
BRIDGEWATER, J., and QUINNBRINTNALL, A.C.J., concur.
NOTES
[1] Exhibit (Ex.) 38 at 1; Br. of Resp't at 4.
[2] Ex. 38 at 5-6.
[3] Ex. 39 at 3.
[4] 104 Wash.2d 392, 706 P.2d 212 (1985).
[5] Report of Proceedings (RP) at 43.
[6] RP at 43.
[7] RP at 46.
[8] 77 Wash.App. 603, 893 P.2d 641 (1995).
[9] RP at 47.
[10] RP at 48.
[11] RP at 52.
[12] The record does not clearly show whether one or both counsel were on the phone.
[13] RP at 54.
[14] RP at 55.
[15] RP at 57.
[16] RP at 55.
[17] 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.70[6] [a] (3d ed.2002); Limstrom v. Ladenburg, 136 Wash.2d 595, 607-08, 963 P.2d 869 (1998) (privilege "promotes and protects the effectiveness of our adversarial judicial system").
[18] Hickman v. Taylor, 329 U.S. 495, 516, 67 S.Ct. 385, 91 L.Ed. 451 (1947), rehearing denied, 336 U.S. 921, 69 S.Ct. 636, 93 L.Ed. 1083 (1949) (Jackson, J., concurring) (privilege protects against litigation "on wits borrowed from the adversary"); Crenna v. Ford Motor Co., 12 Wash. App. 824, 831, 532 P.2d 290, review denied, 85 Wash.2d 1011 (1975) (fundamental fairness requires that discovery not be used to probe opponent's trial preparation); Admiral Ins. Co. v. United States Dist. Court, 881 F.2d 1486, 1494 (9th Cir.1989) (privilege "prevent[s] exploitation of a party's efforts in preparing for litigation").
[19] CR 26(b)(4) was formerly CR 26(b)(3). It was renumbered in 1990. 115 Wash.2d 1163-64 (1990).
[20] CR 26(b)(5) was formerly CR 26(b)(4). It was renumbered in 1990. 115 Wash.2d 1164 (1990).
[21] In re Firestorm 1991, 129 Wash.2d 130, 158, 916 P.2d 411 (1996) (Madsen, J., concurring).
[22] FRCP 26(b)(3) corresponds to Washington's CR 26(b)(4).
[23] FRCP 26(b)(4) corresponds to Washington's CR 26(b)(5).
[24] In re Firestorm, 129 Wash.2d at 157-58, 916 P.2d 411 (quoting Bogosian, 738 F.2d at 594). See also Haworth, 162 F.R.D. at 293. We do not overlook Firestorm's lead opinion. Subscribed to by only four of the eight participating justices, it asserted "that CR 26(b)(4) does not apply to situations falling within CR 26(b)(5)." In re Firestorm, 129 Wash.2d at 137, 916 P.2d 411. If it meant that CR 26(b)(4) and CR 26(b)(5) must be read together, but that CR 26(b)(5) controls in the event of a conflict, we agree. If it meant that CR 26(b)(4) does not apply when a party seeks discovery from an expert, we are not bound or persuaded. Roy Supply Inc. v. Wells Fargo Bank, 39 Cal.App.4th 1051, 46 Cal.Rptr.2d 309, 319 (1995) ("[i]t is well established that an opinion that expresses the views of less than a majority of the members of the court is not precedent"); State v. Jones, 171 Or.App. 375, 15 P.3d 616, 625 (2000), review denied, 332 Or. 56, 26 P.3d 150 (2001) ("plurality's reasoning is not `binding as precedent'"); Osick v. Public Employee Retirement System, 122 Idaho 457, 835 P.2d 1268, 1270 (1992) (plurality's "rationale is not controlling for other cases"); People v. Dauer, 131 Mich. App. 839, 346 N.W.2d 599, 600 (1984) (plurality's reasoning "not binding ... under the doctrine of stare decisis"); Coates & Hopkins Realty Co. v. Kansas City Terminal Ry. Co., 328 Mo. 1118, 43 S.W.2d 817, 823 (1931) (plurality opinion produces only a decision in the result, not the reasoning); Thomas v. City of Ft. Pierre, 59 S.D. 519, 241 N.W. 327, 327 (1932) (plurality's opinion "constitute[s] no precedent beyond the mere result arrived at"). Accord, W.R. Grace & Co. v. Dep't of Revenue, 137 Wash.2d 580, 593, 973 P.2d 1011, cert. denied, 528 U.S. 950, 120 S.Ct. 371, 145 L.Ed.2d 290 (1999) ("[w]here there is no majority agreement as to the rationale for a decision, the holding of the court is the position taken by those concurring on the narrowest grounds"); Davidson v. Hensen, 135 Wash.2d 112, 128, 954 P.2d 1327 (1998) (same).
[25] Quoted exactly, CR 26(b)(5) states in part:

(5) Trial Preparation: Experts. Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:
(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial .... (ii) A party may ... depose each person whom any other party expects to call as an expert witness at trial.
(B) A party may discover facts known or opinions held by an expert who is not expected to be called as a witness at trial, only as provided in rule 35(b) or upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.
[26] Quoted exactly, CR 26(b)(4) states in part:

(4) Trial Preparation: Materials. Subject to the provisions of subsection (b)(5) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subsection (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means....
[27] We perceive no difference between PIP arbitration or PIP litigation for purposes of work product protection. Although discovery in arbitration is typically more limited than discovery in litigation, compare MAR 4.2 and CR 26, the reasons for work product protection are the same. Thus, information acquired, prepared, or developed in anticipation of PIP arbitration is entitled to as much (or as little) work product protection as information acquired, prepared, or developed in anticipation of PIP litigation.
[28] 104 Wash.2d 392, 706 P.2d 212.
[29] Heidebrink, 104 Wash.2d at 400, 706 P.2d 212.
[30] 104 Wash.2d at 400, 706 P.2d 212.
[31] 114 Wash.2d 198, 787 P.2d 30 (1990).
[32] 114 Wash.2d at 209, 787 P.2d 30.
[33] 114 Wash.2d at 209-10, 787 P.2d 30 (citations omitted). Accord, Federal Trade Commission v. Grolier Inc., 462 U.S. 19, 26, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) ("work product of agency attorneys would not be subject to discovery in subsequent litigation unless there was a showing of need").
[34] 120 Wash.2d 782, 845 P.2d 995 (1993).
[35] 136 Wash.2d 595, 963 P.2d 869.
[36] 120 Wash.2d at 790, 845 P.2d 995.
[37] 136 Wash.2d at 613, 963 P.2d 869.
[38] 77 Wash.App. 603, 893 P.2d 641.
[39] 77 Wash.App. at 609, 893 P.2d 641.
[40] 77 Wash.App. at 609, 893 P.2d 641 (quoting Grinnell Corp. v. Hackett, 70 F.R.D. 326, 332 (D.R.I.1976)) (emphasis added).
[41] 77 Wash.App. at 609, 893 P.2d 641 (emphasis added).
[42] 77 Wash.App. at 610, 893 P.2d 641 (emphasis added).
[43] Ezell v. Hutson, 105 Wash.App. 485, 491, 20 P.3d 975, review denied, 144 Wash.2d 1011, 31 P.3d 1185 (2001) ("we are bound by stare decisis to follow our Supreme Court's decisions"); 1519-1525 Lakeview Blvd. Condo. Ass'n v. Apartment Sales Corp., 101 Wash.App. 923, 937, 6 P.3d 74 (2000), aff'd, 144 Wash.2d 570, 29 P.3d 1249 (2001) ("[w]e must defer to the holding of our highest court").
[44] The attorney-client privilege is analogous. Having attached initially, it continues even after the attorney-client relationship terminates. Swidler & Berlin v. United States, 524 U.S. 399, 406-07, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).
[45] Johnson, 77 Wash.App. at 608, 893 P.2d 641; Crenna, 12 Wash.App. at 828, 532 P.2d 290; Mothershead v. Adams, 32 Wash.App. 325, 328, 647 P.2d 525, review denied, 98 Wash.2d 1001 (1982). Compare 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024 at 357 (2d ed.1994) (work product protection "is applicable to the discovery stage only, and it is not a limitation on the use of evidence at trial") (citing Justice White's concurring opinion in United States v. Nobles, 422 U.S. 225, 243-51, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975)).
[46] Olson v. Haas, 43 Wash.App. 484, 487, 718 P.2d 1 (1986) ("the [attorney-client] privilege is personal to the client"); State v. Martin, 91 Wash.App. 621, 634-35, 959 P.2d 152 (1998), aff'd, 137 Wash.2d 774, 975 P.2d 1020 (1999) ("[t]he communicant is the holder of the [priestpenitent] privilege"); Hager v. Bellingham, 74 Wash.App. 49, 63, 871 P.2d 1106 (1994) ("[t]he holder of the [psychologist-patient] privilege is the patient").
[47] Limstrom v. Ladenburg, 110 Wash.App. 133, 143 n. 11, 39 P.3d 351 (2002) ("the ability to protect work product normally extends to both clients and attorneys, and the attorney or the client, expressly or by conduct, can waive or forfeit it, but only as to himself") (quoting In re Doe, 662 F.2d 1073, 1079 (4th Cir.1981), cert. denied, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982)); Pappas, 114 Wash.2d 198, 787 P.2d 30 (attorneys who collected information apparently had standing to claim work product protection); Dever v. Fowler, 63 Wash.App. 35, 816 P.2d 1237 (1991), review denied, 118 Wash.2d 1028, 828 P.2d 563 (1992) (same); 6 JAMES WM. MOORE ET AL. MOORE'S FEDERAL PRACTICE § 26.70 [8] (3d ed.2002); see also John T. Hundley, Annotation, Waiver of Evidentiary Privilege by Inadvertent DisclosureFederal Law, 159 A.L.R. FED. 153 § 4[c] (2000) (work product privilege belongs to attorney) (citing In re Crescent Towing & Salvage Co., Inc., 1993 WL 483525 *1 (E.D.La. 1993)); In re Antitrust Grand Jury, 805 F.2d 155, 163 (6th Cir.1986) (privilege may be invoked by client or attorney); Duplan Corp. v. Moulinage et Retorderie de Chavanoz, 487 F.2d 480, 483 n. 12 (4th Cir.1973) (work product privilege is attorney's).
[48] 135 Wash.2d 398, 957 P.2d 632, recons. denied, 966 P.2d 305 (1998) (insurer must seek PIP reimbursement through insured's lawsuit against tortfeasor).
[49] 140 Wash.2d 267, 996 P.2d 603 (2000) (with proper notice, UIM insurer is bound by UIM tort litigation).
[50] 136 Wash.2d 240, 961 P.2d 350 (1998) (with proper notice, UIM insurer is bound by UIM tort arbitration or litigation).
[51] 63 Wash.App. 35, 816 P.2d 1237.
[52] 63 Wash.App. at 47, 816 P.2d 1237 (emphasis added).
[53] 63 Wash.App. at 47, 816 P.2d 1237.
[54] 63 Wash.App. at 47, 816 P.2d 1237 (emphasis added).
[55] 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2024 at 354-56 (2d ed.1994) (footnotes omitted) (emphasis added).
[56] 77 Wash.App. 603, 893 P.2d 641. We are uncertain whether the Johnson court transformed the quoted sentence into a holding, for we see no reason why it would have needed to do that. The court commented that "[n]either Ms. Johnson nor her representatives chose to be examined by Dr. Grow," but that if they had, Dr. Grow's "medical evaluation ... would clearly have been in anticipation of litigation." 77 Wash.App. at 609, 893 P.2d 641. Thus, the court seems to have held that Johnson was not a holder of work product protection because she was not the party who had initially prepared, acquired or developed the information in question (and thus not the party in whose favor work product protection had initially attached). The court further commented that Dr. Grow's "medical examination ... was for the purpose of evaluating [the PIP carrier's] continuing obligation to pay PIP benefits to Ms. Johnson[,]" and that "Dr. Grow's medical examination of Ms. Johnson was not, therefore, in anticipation of this litigation." 77 Wash.App. at 609, 893 P.2d 641. Thus, the court seems to have held, as already discussed above, that work product protection can be claimed only in the litigation in which it initially attached. Given that either holding was dispositive, the court had no need to address whether one in whose favor work product protection initially attaches can claim such protection only in subsequent litigation to which he or she is a party.
[57] 77 Wash.App. at 609, 893 P.2d 641 (quoting 8 WRIGHT, MILLER & MARCUS, supra, n. 55, § 2024 at 354).
[58] 63 Wash.App. at 47, 816 P.2d 1237.
[59] We might well reach the opposite result if the record clearly showed that both counsel participated in the phone call to Randolph, or that both counsel clearly stipulated on the record in open court that a person with authority at USAA had claimed work product protection on USAA's behalf. See CR 2A. The record here, however, is not that clear.
[60] 43 Wash.App. 484, 718 P.2d 1.
[61] See also State v. Martin, 137 Wash.2d 774, 784, 975 P.2d 1020 (1999) (priest-penitent privilege claimed by minister); Olson, 43 Wash.App. at 487, 718 P.2d 1 (attorney-client privilege asserted by attorney); Christensen v. Munsen, 123 Wash.2d 234, 239, 867 P.2d 626 (1994) (physician may only testify after the patient has waived the privilege).
[62] Van Noy v. State Farm Mut. Auto. Ins. Co., 142 Wash.2d 784, 793, 16 P.3d 574 (2001) (citing Van Noy v. State Farm Mut. Auto. Ins. Co., 98 Wash.App. 487, 492, 983 P.2d 1129 (1999)); see also Ellwein v. Hartford Acc. & Indem. Co., 142 Wash.2d 766, 779-81, 15 P.3d 640, recons. denied (2001); Safeco Ins. Co. of Am. v. Butler, 118 Wash.2d 383, 389, 823 P.2d 499, recons. denied (1992); Tank v. State Farm Fire & Cas. Co., 105 Wash.2d 381, 385-86, 715 P.2d 1133 (1986); Tyler v. Grange Ins. Ass'n, 3 Wash.App. 167, 173-77, 473 P.2d 193 (1970).
[63] CR 35(a) and (b) provide:

(a) Examination.
(1) Order for Examination. When the mental or physical condition (including the blood group) of a party, or of a person in the custody or under the legal control of a party, is in controversy, the court in which the action is pending may order the party to submit to a physical examination by a physician, or mental examination by a physician or psychologist or to produce for examination the person in the party's custody or legal control. The order may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.
(2) Representative at Examination. The party being examined may have a representative present at the examination, who may observe but not interfere with or obstruct the examination.
(3) Recording of Examination. Unless otherwise ordered by the court, the party being examined or that party's representative may make an audiotape recording of the examination which shall be made in an unobtrusive manner. A videotape recording of the examination may be made on agreement of the parties or by order of the court.
(b) Report of Examining Physician or Psychologist. The party causing the examination to be made shall deliver to the party or person examined a copy of a detailed written report of the examining physician or psychologist setting out the examiner's findings, including results of all tests made, diagnosis and conclusions, together with like reports of all earlier examinations of the same condition, regardless of whether the examining physician or psychologist will be called to testify at trial. The report shall be delivered within 45 days of the examination and in no event less than 30 days prior to trial. These deadlines may be altered by agreement of the parties or by order of the court. If a physician or psychologist fails or refuses to make a report in compliance herewith the court shall exclude the examiner's testimony if offered at the trial, unless good cause for noncompliance is shown.
[64] The record does not show that Drake was unable to retain her own expert under CR 35, or that she had any particular need to appropriate USAA's expert.
[65] Public Util. Dist. No. 1 of Klickitat County v. Int'l Ins. Co., 124 Wash.2d 789, 813, 881 P.2d 1020 (1994); State v. Silva, 107 Wash.App. 605, 611, 27 P.3d 663 (2001).
[66] Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993); Mehlenbacher v. DeMont, 103 Wash.App. 240, 251, 11 P.3d 871 (2000); Mayer v. City of Seattle, 102 Wash.App. 66, 79, 10 P.3d 408 (2000), review denied, 142 Wash.2d 1029, 21 P.3d 1150 (2001).
[67] The record contains formal trial setting notices for June 1, 1999, September 27, 1999, May 16, 2000, May 23, 2000, May 31, 2000, October 2, 2000, October 3, 2000, March 20, 2001, and April 10, 2001.
[68] RP at 268.
[69] Finkleman Deposition (Dep.) at 10.
[70] Finkleman Dep. at 38.
[71] Bennett v. Messick, 76 Wash.2d 474, 478-79, 457 P.2d 609 (1969); Greenwood v. Olympic, Inc., 51 Wash.2d 18, 23, 315 P.2d 295 (1957); Reeder v. Sears, Roebuck & Co., 41 Wash.2d 550, 555-56, 250 P.2d 518 (1952); 6 WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 30.18, at 309 (4th ed. 2002) (WPI).
[72] Dr. Nacht testified that Harris had a bony prominence in his left shoulder prior to the accident. Nacht Dep. at 61.
[73] See ER 401.
[74] Miller v. Payless Drug Stores of Wash. Inc., 61 Wash.2d 651, 653, 379 P.2d 932 (1963); Moe v. Wise, 97 Wash.App. 950, 956-57, 989 P.2d 1148 (1999), review denied, 140 Wash.2d 1025, 10 P.3d 406 (2000); see also Bender v. City of Seattle, 99 Wash.2d 582, 587, 664 P.2d 492 (1983); Ripley v. Grays Harbor County, 107 Wash.App. 575, 579, 27 P.3d 1197 (2001); CR 50(a); RCW 4.56.120.
[75] Bennett, 76 Wash.2d at 478-79, 457 P.2d 609; Greenwood, 51 Wash.2d at 23, 315 P.2d 295; Reeder, 41 Wash.2d at 555-56, 250 P.2d 518; WPI 30.18, at 309.
[76] Br. of Resp't at 53.
[77] Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 32, 442 P.2d 621 (1968).
[78] Hansen v. Rothaus, 107 Wash.2d 468, 477, 730 P.2d 662 (1986); Fox v. Mahoney, 106 Wash. App. 226, 230, 22 P.3d 839 (2001).
[79] See Fox, 106 Wash.App. at 230, 22 P.3d 839 (unliquidated claim for "past economic damages").
[80] See also RCW 4.56.110(3) ("in any case where a judgment entered on a verdict is wholly or partly affirmed on review, interest on the judgment or on that portion of the judgment affirmed shall date back to and shall accrue from the date the verdict was rendered").